Cobb, City Clerk *v.* Burress.

4-8523                                      209 S. W. 2d 694

Opinion delivered March 29, 1948.

178

*Roy Penix* and *Foster Clarke,* for appellant.

*Barrett, Wheatley & Smith,* for appellee.

ED. F. McFADDIN, Justice. This appeal challenges the correctness of a circuit court judgment which awarded a writ of mandamus against the appellant, and thereby allowed a referendum on an ordinance of the City of Jonesboro.

On July 28, 1947, the city council of Jonesboro enacted its ordinance No. 757 levying a tax on certain occupations in that city. The ordinance was published on August 2, 1947, and for three successive weeks thereafter. On September 20, 1947, appellee and others filed with appellant, as city clerk of Jonesboro, a petition for a referendum on said ordinance No. 757—*i. e.,* they sought to have the ordinance submitted to a vote at the municipal election on April 6, 1948. The petition was in 21 parts or divisions (but all together constituting one petition), and contained a total of 406 signatures. Appellant, acting on the advice of the city attorney, refused to certify the referendum petition to the election commissioners.

Thereupon, appellee, as a citizen and taxpayer, instituted this mandamus proceeding on November 14, 1947. The complaint alleged, *inter alia,* that the 406 signatures were "more than 15% of the legal voters . . . casting their vote for the office of mayor at the last preceding general election, . . .", and that the suggested ballot title was sufficient. The complaint prayed that the court "issue a writ of mandamus to the said James Carr Cobb, city clerk, compelling him to certify said petition for ballot title to the election commissioners." Appellant, by response, claimed that the petition for referendum: (a) was filed too late; (b) did not contain 15% of all of the qualified electors; (c) contained signatures that were forgeries; and (d) was circulated by canvassers who were guilty of such fraud as to forfeit certain signatures and leave an insufficient number of valid signatures.

The cause proceeded to a hearing in the circuit court on evidence hereinafter to be detailed in the appropriate topics; and on December 18, 1947, the circuit court granted the mandamus as prayed by the appellee. This appeal[1] challenges the circuit court order, and presents the issues now to be discussed.

I. *Appellant Insists that Section 13309, Pope's Digest, Defeats the Attempted Referendum.* As previously stated, ordinance No. 757 was enacted on July 28, 1947, was published the first time on August 2nd, and the referendum petition was filed with the city clerk on September 20, 1947. This filing was 54 days after the ordinance was enacted, and 48 days after publication; and appellant says that this was too late. Amendment No. 7 (as now numbered) to the Arkansas Constitution was adopted by the people on November 2, 1920, and declared adopted by the Special Supreme Court in the case of *Brickhouse* v. *Hill,* 167 Ark. 513, 268 S. W. 865. Section V[2] of said Amendment No. 7 reads in part:

"Municipalities may provide for the exercise of the initiative and referendum as to their local legislation.

"General laws shall be enacted providing for the exercise of the initiative and referendum as to counties. . . . In municipalities and counties the time for filing an initiative petition shall not be fixed at less than sixty days nor more than ninety days before the election at which it is to be voted upon; for a referendum petition at not less than thirty days nor more than ninety days after the passage of such measure by a municipal council; . . ."

It will be observed that the said Constitutional Amendment gives to municipalities the right to provide for the exercise of referendum as to local legislation, and

---

[1] The appeal was filed in this court on January 22, 1948. On February 20th appellant moved that the cause be advanced because of public interest: and we ordered the advancement as prayed.

[2] In the dissenting opinion in *Dixon* v. *Hall,* 210 Ark. 891, 198 S. W. 2d 1002 the various paragraphs of the amendment were numbered as sections, and that identification method is followed here for convenient reference—a method concurred in by other members of the court—, but without affording any other support to the said dissenting opinion.

that the time for filing petitions for referendum may be fixed by each municipality at "not less than thirty days nor more than ninety days after the passage of such measure by a municipal council." It is here stipulated that, prior to the inception of this proceeding, the city council of Jonesboro had enacted no ordinance regulating the time for filing a referendum petition. Because of this stipulated fact, appellant relies on § 13309, Pope's Digest, which section is from Act 197 of 1935. That act is captioned "An Act Limiting the Time for Filing Referendum Petitions on Municipal Measures to Thirty Days after the Passage of Such Measures." Section 1 of the said act reads:

"The time for filing petitions for referendum on municipal measures as defined in the Initiative and Referendum Amendment to the Constitution, which amendment was voted on at the general election, November 2, 1920, as amendment Number 13³, shall be and hereby is limited to thirty days after the passage of any such measure."⁴

It is unmistakably clear that by Act 197 the 1935 General Assembly attempted to limit to thirty days the time within which a petition might be filed for a referendum on a municipal ordinance. But § 22 of said Constitutional Amendment No. 7 provides that the amendment "shall be self-executing, . . . but laws may be enacted to facilitate its operation." This language appears: *"No legislation shall be enacted to restrict, hamper or impair the exercise of the rights herein reserved to the people."* A reference to the dictionary (Webster's Unabridged, New International, Second Ed., published in 1944) shows the primary meaning of "restrict" to be "to limit"; and the Act 197 of 1935 shows that it was a

³ Our present Amendment No. 7 was formerly numbered as Amendment No. 13, but was correctly renumbered as Amendment No. 7 in Pope's Digest. For full explanation as to the numbering of the Amendment to our present Constitution, see the Parallel Reference Table to Amendments, pp. 197-8 of Vol. 1 of the Arkansas Statutes Annotated of 1947 now in process of publication by. Bobbs-Merrill Company; Amendment No. 7 may be found on p. 204 of Vol. I of said publication.

⁴ This Section 13309 Pope's Digest is also Section 2-402 of the Arkansas Statutes Annotated of 1947.

legislative attempt to *limit* the time for filing referendum petitions on municipal measures. The Constitutional Amendment No. 7 left to each municipality the right to fix the time for filing referendum petitions on municipal legislation; and it is beyond the power of the Legislature to limit the said constitutional right given to municipalities. So we hold that this Act 197 of 1935 is void insofar as it limits the time for filing referendum petitions on municipal legislation.

In *Southern Cities Dist. Co.* v. *Carter,* 184 Ark. 4, 41 S. W. 2d 1085, we considered a case where the city council had enacted no ordinance fixing the time for filing referendum petitions on municipal legislation. In *Railey* v. *Magnolia,* 197 Ark. 1047, 126 S. W. 2d 273, we considered a case where the city council had fixed the time for filing a referendum petition on municipal legislation. Both of these cases recognized that it was for each municipality to fix the time for filing such referendum petitions. Until the City of Jonesboro fixes some time by municipal ordinance, then the constitutional language of "not less than thirty days nor more than ninety days" is the applicable period. The Legislature cannot limit the right of the municipalities in this regard. *Kitchens* v. *Paragould,* 191 Ark. 940, 88 S. W. 2d 843, while not in point on the question here involved, nevertheless, shows a judicial recognition that the Legislature cannot impede municipalities in their exercise of constitutionally granted powers. Text writers generally recognize this principle as applicable to constitutional grants of referendum on municipal legislation. In 28 Am. Juris. 155, in discussing initiative and referendum, this statement appears:

"On the other hand, an enabling act of the Legislature, intended to carry into effect a self-executing constitutional provision conferring the right of initiative and referendum, which imposes restrictions on proposed legislation not found in the Constitution, is invalid."

It follows that the appellant cannot prevail in his reliance on § 13309, Pope's Digest, since that section is void to the extent herein stated.

II. *Appellant Insists that Section 9733, Pope's Digest, Defeats the Attempted Referendum.* Sections 9728-33, inclusive, Pope's Digest,[5] are from Act 294 of 1937, which act was an amendment of Act 94 of 1919.[6] The only substantial difference between the 1937 and the 1919 acts was that the 1937 act extended to all municipalities the right to levy occupational taxes—a power which the 1919 act gave only to cities of the first and second classes. Section 6 of the 1937 act is a copy of § 6 of the 1919 act, and is now § 9733, Pope's Digest, and reads:

"Upon a petition signed by fifteen percent. of the qualified electors of said city or town, *as shown by the latest payment of poll tax,* being filed with the clerk or recorder of said city or town, *within thirty days* from the date of first publication of the ordinance, an election shall be called by said city council, board of commissioners or board of aldermen within ninety days from the date of the filing of said petition, and said ordinance shall be referred to the qualified electors of said city or town, and if a majority of the votes cast at such election is against said ordinance, it shall stand repealed. The repealing of any ordinance at an election as provided by this Act, does not prohibit the passage of a new ordinance under the provisions of this Act." (Italics our own.)

The second italicized phrase of this section—*i. e.,* "within thirty days"—limits the referendum time to thirty days; and what we have said in Topic I, *supra,* applies here. The thirty-day limitation is void insofar as this case is concerned.

The first italicized phrase in the above section refers to the number of electors who must sign the referendum petition, and requires 15% of the qualified electors "as shown by the latest payment of poll taxes." But this legislative limitation, on the right for a referendum, must be considered in comparison with Constitutional Amendment No. 7; and the legislative requirement must

---

[5] These sections may be found in §§ 19-4601, *et seq.,* Ark. Stat. Ann. (1947).

[6] The 1919 act is an amendment of Act 179 of 1917.

yield to the Constitutional guarantee. Section 5 of said Constitutional Amendment No. 7 says:

" . . . Fifteen percent. of the legal voters of any municipality . . . may order the referendum, . . . upon any local measures. In municipalities the number of signatures required upon any petition shall be computed *upon the total vote cast for the office of mayor at the last preceding general election;* . . ." (Italics our own.)

It is readily apparent that the constitutional amendment allows referendum on a municipal ordinance when the petition contains signatures totaling 15% *of the total vote cast for the office of mayor in the last preceding general election,* whereas the statute (§ 9733, Pope's Digest) requires that there be 15% *of the qualified electors "as shown by the latest payment of poll tax."* Insofar as the statute requires a greater number of voters than the constitutional amendment, to that effect, this statute must fail. In the case at bar it is stipulated that there were 2,956 qualified electors as shown by the latest payment of poll tax; but that there were only 1,884 votes cast for mayor in the last preceding general election. We hold that the language of the constitutional amendment is the governing criterion; and that the referendum petition in this case need contain only the signatures of 283 qualified electors, as that number is 15% of the figure of 1,884—the number of votes cast for mayor in the last preceding general election. The petitions for referendum of ordinance No. 757 contained more than 283 valid signatures, as will appear from the discussion in Topic III, *infra.*

Appellant, in insisting that § 9733 is valid, says:

"The validity of this provision for referendum applying to occupation tax ordinances alone was upheld by the Supreme Court of this State in the case of *Davies* v. *Hot Springs,* 141 Ark. 521, 217 S. W. 769, which held that this section (Act of February 19, 1919, page 82, § 6) is not void as the Legislature *may confer or withhold the referendum and may prescribe the terms on which it may be exercised.*"

The case of *Davies* v. *Hot Springs* (cited by appellant in the quotation above) was decided on January 19, 1920, and was based on our former I. & R. Amendment, and not on Constitutional Amendment No. 7 now in force. The first I. & R. Amendment adopted in Arkansas was in 1910, and it was then called "Amendment No. 10."[7] It was so referred to in *Tomlinson Bros.* v. *Hodges,* 110 Ark. 528, 162 S. W. 64, and in *Davies* v. *Hot Springs, supra.* In a re-numbering of constitutional amendments, this 1910 I. &. R. Amendment became "Amendment No. 7," and as so numbered may be found on p. 131 of C. & M. Digest of 1921. The I. & R. Amendment of 1910 did not itself provide for referendum on municipal ordinances, but gave the power to the Legislature to so provide; and the Legislature enacted a referendum for municipal ordinances by Act. No. 2 of the Special Session of 1911 (as found on p. 582 of the printed Acts of 1911). Since, under the 1910 I. & R. Amendment, the Legislature had the power to grant or refuse referendum on municipal ordinances, it follows that the language found in *Davies* v. *Hot Springs* was correct when that opinion was announced. But at the general election on November 2, 1920, the people adopted a new I. & R. Amendment (our present Amendment No. 7), which superseded the 1910 I. & R. Amendment; and in the present Amendment No. 7 the right of referendum on municipal ordinances is directly granted to electors in municipalities, independent of legislative enactment. We have previously discussed this fact. Therefore, *Davies* v. *Hot Springs* is outmoded insofar as the point here at issue is concerned, since it was decided under a constitutional amendment that has been superseded since the decision.

Finally, under this topic, appellant urges that the Legislature, by §§ 9728-33, Pope's Digest, allowed cities to enact an occupation tax subject to a referendum, as stated in those sections, and that the referendum on an occupation tax is entirely different from the referendum on any other ordinance. On this argument appellant insists that § 9733 is valid as a legislative grant of power

---

[7] See Parallel Reference Table to' Amendments, pp. 197-8 of The Ark. Stat. Ann. (1947), as previously mentioned.

to a municipality on an expressed condition for a specific kind of referendum. Appellant says that a city had no right to pass an occupation tax until that power was granted by the Legislature; and that the Legislature, in granting to a municipality the right to enact an occupation tax ordinance, had the right to limit or prescribe the manner in which the ordinance would come into effect or be referred. As supporting this argument, appellant cites *Smith* v. *Plant,* 179 Ark. 1024, 19 S. W. 2d 1022 and *Johnston* v. *Bramlett,* 193 Ark. 71, 97 S. W. 2d 631. These cases are cited but as presenting analogous situations. We find no analogy. *Smith* v. *Plant* was a stock law case, and the question was whether White county could initiate a county-wide stock law or take advantage of a legislative enactment. We held that the initiated Act was not contrary to any general statute in effect in White county. *Johnson* v. *Bramlett* was an attack on the local option liquor law, the claim being there made that the local option law required 35% of the voters, whereas the referendum amendment required a smaller percentage. That case has no bearing here, and is limited to its own situation. The decisive point in the case at bar is, that the Constitutional Amendment No. 7 (in § 5 thereof) reserves to the legal voters of each municipality the right of referendum on all of its municipal legislation; and this referendum power extends to any "bill, law, resolution, ordinance, charter, constitutional amendment or legislative proposal or enactment of any character."[8] The constitutional right of referendum possessed by the citizens of a municipality transcends any attempted legislative restriction; and for that reason appellant cannot prevail in his reliance on § 9733, Pope's Digest.

III. *Appellant Insists that the Referendum Petition Contained Signatures that were not Genuine; and also that the Canvassers were Guilty of Such Fraud as to Prevent the Referendum.* To be specific, the proof showed:

(a) that Mr Ballew signed his wife's name on part 6 of the referendum petition; that this part 6 contained

[8] See § 6 of Constitutional Amendment No. 7.

a total of 12 signatures; and that the canvasser who made the affidavit on this part was J. T. Scarry;

(b) that Mr. Bowden signed the names of his wife and two sons on part 9 of the referendum petition; that this part 9 contained a total of 16 signatures; and that the canvasser who made the affidavit on this part was John Thomas;

(c) That James Thomas signed his wife's name on part 14 of the referendum petition; that this part 14 contained a total of 25 signatures; and that the canvasser who made the affidavit on this part was J. T. Scarry; and

(d) that Mr. Reed signed his wife's name on part 17 of the referendum petition; that this part 17 contained a total of 31 signatures; and that the canvasser who made the affidavit on this part was Billy Price.

To summarize: six signatures were shown to be non-genuine; these were on four parts of the referendum petition, which four parts contained a total of 84 signatures. In each of the six cases of the non-genuine signatures it was shown that the signature had been subsequently ratified; but these signatures were non-genuine, and must be stricken under the authority of *Hargis* v. *Hall,* 196 Ark. 878, 120 S. W. 2d 335. Still, when we strike these six non-genuine signatures, there remain 400 genuine signatures, and that number is more than sufficient.

Appellant, however, claims that (a) when a non-genuine signature is shown on a list, and (b) when the canvasser has verified that the signature was made in person, then (c) the entire affidavit of the canvasser is false and all the signatures on the part covered by the affidavit of such canvasser must be stricken. Appellant claims that the case of *Sturdy* v. *Hall,* 201 Ark. 38, 143 S. W. 2d 552, supports his contentions. On the other hand, appellee introduced evidence tending to show that the canvassers had acted in good faith, and that the affidavits concerning the six non-genuine signatures were made without willful intent; and by this line of evidence, appellee seeks to bring the case at bar within the

rule announced in *Sturdy* v. *Hall,* 204 Ark. 785, 164 S. W. 2d 884, in which case we struck only the non-genuine signatures. The facts here make unnecessary any further discussion as to the legal questions. As previously stated in this Topic III, the six non-genuine signatures appeared in parts 6, 9, 14 and 17. Assuming—but not deciding—that we struck all of the signatures contained in these four parts, we would remove a total of 84 signatures; and deducting the 84 signatures from the 406 signatures would leave 322, which number is greater than the required 283.

To overcome this last-stated result, appellant claims that these same canvassers who made the affidavits on parts 6, 9, 14 and 17 of the referendum petition—*i. e.,* the canvassers, Scarry, Thomas and Price—also circulated other parts of the referendum petition and made affidavits on the other parts; and appellant claims that all of the parts (in addition to parts 6, 9, 14 and 17) containing an affidavit of either Scarry, Thomas or Price should be stricken, even though there is no proof that such other parts contained non-genuine signatures. We refuse to follow the appellant's argument to such an extreme position. The proof here shows that there was an honest effort by citizens to obtain a referendum election, and it would defeat the very purpose of the constitutional amendment to allow vague presumptions of fraud to overcome tangible evidence of good faith. In short, appellant cannot prevail on his charges of "forgery and fraud."

### Conclusion

We have considered all the assignments urged by appellant, and find the circuit court order to be correct, and it is affirmed. Furthermore, it is made to appear to this court that there is good cause for an immediate mandate in this case (see § 2777, Pope's Digest), and so an immediate mandate is ordered issued.